# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ADAM FULLER, STEVE SPRAGUE, GABRIELLA GOURDIN, CHARLOTTE JONES, MIKAELI LECHUGA, AIMEE NGUYEN, STEVE ROSALES, HANNAH WILSON, RILEY WESTERGARD, TED WINKWORTH, BROGAN KNEBEL, REBECCA RODRIGUEZ, PATRICK MAC, and ANNIKA BOUTTAVONG, <br><br> Plaintiffs, <br><br> v. <br><br> SALT LAKE CITY, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT FOR THE DEFENDANT** <br><br> Case No. 2:21-cv-593-HCN <br><br> Howard C. Nielson, Jr. <br> United States District Judge <br><br> FOR PUBLICATION |

Plaintiffs, a group of individuals who were arrested or forcibly dispersed while violating a municipal curfew briefly imposed after the death of George Floyd, sue Defendant Salt Lake City, asserting various claims under 42 U.S.C. § 1983 and the United States Constitution. The City moves for summary judgment, and the Plaintiffs move for partial summary judgment. The court grants summary judgment for the City on all of the Plaintiffs' claims.

## I.

Civil unrest broke out in Salt Lake City on May 30, 2020, after the death of George Floyd in police custody in Minneapolis. Several buildings—including the Utah State Capitol—were vandalized with spray paint, and many windows were broken. *See* Dkt. No. 41-25; Dkt. No. 43-4. Multiple stores in the City Creek Center mall were vandalized and looted. *See* Dkt. No. 43-2 (0:00–2:27). And a police vehicle was flipped upside down, befouled, and set ablaze. *See* Dkt. No. 41-19 (0:00–1:10); Dkt. No. 41-21. When law enforcement officers arrived at one site of unrest, the intersection between the Salt Lake City and County Building and the Public Library,

they faced a crowd of hundreds, some of whom threw glass bottles, rocks, and other projectiles—including a baseball bat—at the police. *See, e.g.*, Dkt. No. 42-13 (0:50–1:13). When an individual exited his vehicle and aimed a bow and arrow at crowd members, he was assaulted and beaten, and his vehicle was overturned, vandalized, and burned. *See* Dkt. No. 42-4 (0:05–5:45). These are only a few examples of the acts of vandalism and violence that occurred.

That same day, Mayor Erin Mendenhall issued a statement condemning "George Floyd's murder at the hands of rogue police officers," and stated on social media platforms that she was "committed to intentionally addressing and dismantling the systemic oppression, discrimination, racism, and bigotry that exists in our city." Dkt. No. 44-13 at 3; Dkt. No. 44-14 at 2. Nevertheless, invoking the unrest and violence unfolding in the City, the Mayor issued Salt Lake City Emergency Proclamation No. 9 of 2020, declaring a local emergency and imposing a curfew. *See* Dkt. No. 41-1 at 2–3.

Specifically, Mayor Mendenhall found that an emergency existed because the unrest and violence "create[d] a risk of significant injury and death to individuals, as well as significant destruction to public and private property," and that "extraordinary measures must be taken to preserve order . . . , especially during the time periods where much of this [violence and destruction] could occur under cover of darkness." *Id.* at 2. She accordingly imposed a curfew "in all public places within the geographical boundaries of Salt Lake City . . . from Saturday, May 30, 2020 at 8 p.m. to Monday, June 1, 2020 at 6 a.m." *Id.* "During the hours of curfew, all persons [were] prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of travel." *Id.*

The curfew order included exceptions for (1) "[a]ll law enforcement, fire paramedics or other medical personnel, Utah National Guard, as well as any other emergency response

personnel authorized by Salt Lake City, and credentialed members of the media"; (2) "[i]ndividuals traveling directly to and from work; attending religious services; obtaining food; caring for a family member, friend, or animal; traveling directly to and from the Salt Lake City International Airport; patronizing private businesses; seeking medical care, fleeing dangerous circumstances, or experiencing homelessness"; and (3) "[a]ny person to whom permission by authorized Salt Lake City officials is specifically granted." *Id.* at 2–3. The order provided that a violation of the curfew would be "a class B misdemeanor, which carries with it a risk of a fine of up to $1,000.00 and/or a term of imprisonment of up to 6 months." *Id.* at 3.

On June 1st, after this curfew order expired, Mayor Mendenhall concluded, given the "civil unrest and disorder over the weekend of May 29 – May 31, 2020," that "law enforcement personnel, residents, and visitors have been and remain at risk of significant injury and death." Dkt. No. 41-2 at 2. She also noted in a public statement the same day that "the valid frustration many people feel continues to exhibit itself beyond the bounds of peaceful discourse" nationwide. Dkt. No. 45-9 at 2. She accordingly imposed a nighttime curfew, from 8:00 P.M. to 6:00 A.M., that was intended to begin on the night of June 1st and to continue until the morning of June 8th. *See* Dkt. No. 41-2 at 2.

Once again, the curfew order covered "all public places within the geographical boundaries of Salt Lake City" and prohibited people "from using, standing, sitting, traveling or being present on any public street or in any public place." *Id.* And, once again, the order included substantially similar exceptions. *See id.* at 2–3. That evening, the City continued to experience some unrest. *See, e.g.*, Dkt. No. 42-16 (5:12–5:20, 5:33–42). But while the second curfew order was originally scheduled to last for approximately a week, Mayor Mendenhall terminated the

order on June 3rd after concluding that the protests in the City had become sufficiently nonviolent that a curfew was no longer necessary. *See* Dkt. No. 41-3 at 2.

The Plaintiffs' claims against the City arise from these curfew orders and their enforcement on May 30th and June 1st. Adam Fuller, Steve Sprague, Aimee Nguyen, Gabriella Gourdin, Patrick Mac, and Riley Westergard were arrested on May 30th and charged with failure to disperse after having been in public after 8:00 P.M. *See* Dkt. No. 63 at 9; Dkt. No. 41-4 at 20 (114:15–17); Dkt. No. 46-8 at 5 (76:5–14). Mr. Westergard alleges that a police officer grabbed him by his shirt and threw him to the ground while arresting him. *See* Dkt. No. 46-8 at 8 (89:5–7). Brogan Knebel and Ted Winkworth allege that officers shot them with "less lethal weapon[s]" on May 30th after 8:00 P.M. Dkt. No. 40 at 27, 28 ¶¶ 62, 67; *see also* Dkt. No. 46-9 at 5–6 (83:11–87:10); Dkt. No. 46-11 at 11 (62:23–63:4).

Mikaeli Lechuga, Charlotte Jones, and Steve Rosales were arrested on June 1st and charged with failure to disperse after having been in public after 8:00 P.M. *See* Dkt. No. 45-25 at 13 (146:2–8); Dkt. No. 46-1 at 11 (107:14–16); Dkt. No. 46-19 at 6 (53:10–20). Ms. Lechuga alleges that she was "yanked" to the ground during her arrest. Dkt. No. 45-25 at 14 (153:19–24). And Ms. Jones alleges that an officer fired a less lethal weapon in her direction, causing a piece of gravel to bounce off the ground and hit her. *See* Dkt. No. 46-1 at 5 (81:22–25).

**II.**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact" is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### III.

Plaintiffs contend that the curfew orders violated the First Amendment because they were "impermissibly broad" on their "face[s]," and because "[t]he purpose of the curfew order[s] was to quell and place a prior restraint on all speech, assemblies and peaceful demonstrations related to the death of George Floyd." Dkt. No. 8 at 4–5 ¶¶ 27–28. Plaintiffs further argue that the orders were "on [their] face[s] discriminatory as to George Floyd protestors" because they included several exceptions for activities other than protesting the death of George Floyd. Dkt. No. 63 at 24. Plaintiffs also contend that the orders were selectively enforced, pointing to evidence that they were not enforced against individuals who were not protesting George Floyd's death and who they assert did not fall under any of the enumerated exceptions—such as people walking their dogs. And Plaintiffs point to an email sent on June 3, 2020, by Lance VanDongen, a Salt Lake City police officer, in which he wrote, "I'm really concerned about our preemptive selective enforcement of curfew," "I feel that we are infusing bias into our policing practices by choosing to enforce curfew on a group of protesters, but not enforcing it anywhere else in the city," and "last night the city was full of citizens doing peaceful things and there was no effort by us to cite and/or arrest; yet we were prepared to make curfew arrests of a group of protestors." Dkt. No. 63-16 at 19 (70:16–20, 73:19–22).

The Plaintiffs also maintain that the orders were unconstitutionally vague. The Plaintiffs who were arrested bring Fourth Amendment claims for wrongful arrest, and Mr. Westergard, Mr. Knebel, Mr. Winkworth, Ms. Lechuga, and Ms. Jones bring Fourth Amendment claims for

excessive force. Finally, the Plaintiffs argue that the orders violated their procedural due process rights because they did not receive fair notice and an opportunity to be heard before the orders took effect.

## A.

Because the City does not dispute that at least some of the Plaintiffs were engaged in speech protected by the First Amendment while violating the curfew orders, the court must "determine what level of judicial scrutiny . . . applie[s] to" the orders. *VoteAmerica v. Schwab*, 121 F.4th 822, 838 (10th Cir. 2024). The Plaintiffs argue that the orders are subject to strict scrutiny because they were "[c]ontent-based regulations of speech," or "regulations based upon either the content or the subject matter of the [regulated] speech." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021) (cleaned up). But if the orders were "aimed [only] at regulable conduct"—that is, conduct that is not necessarily expressive—and "ha[d] only an incidental impact on speech," then they would be evaluated "under the four-factor standard of *United States v. O'Brien*." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 & n.8 (1984) (citing 391 U.S. 367 (1968)); *see also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702 (1986) (clarifying that *O'Brien* applies to laws that "regulate conduct that [is not] necessarily expressive" but that incidentally burden those who combine the "otherwise unlawful" conduct with "expressive activity"). And if the orders "directly limit[ed] . . . expression," *Clark*, 468 U.S. at 298 n.8, "without reference to the content of the regulated speech," they "must meet intermediate scrutiny" as "content-neutral regulations," *Brewer*, 18 F.4th at 1220 (cleaned up).

The court concludes that the curfew orders were not content-based regulations of speech. On their faces, the orders were aimed at conduct that is not necessarily expressive, banning people from being outside in public areas regardless of whether they were engaged in speech. To

the extent the orders incidentally burdened speech, they are nevertheless constitutional if they satisfy scrutiny under *O'Brien*. And there can be no genuine dispute that Mayor Mendenhall's purpose in issuing the orders was to prevent obviously regulable conduct like violence and property destruction, not to silence outrage at the death of George Floyd. Indeed, the Mayor issued public statements validating and supporting the protesters' concerns. Finally, there is no evidence in the record to support the conclusion that the enforcement of the orders varied based on the content of anyone's speech. At most, the evidence may support an inference that the City selectively enforced the orders as content-neutral time, place, or manner regulations of public expression generally. Because the orders are properly analyzed either as restrictions of regulable conduct under *O'Brien* or as content-neutral regulations of speech, they are constitutional if they satisfy intermediate scrutiny because the analysis under *O'Brien* "is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark*, 468 U.S. at 298. The court will thus apply intermediate scrutiny.

## 1.

On their faces, the curfew orders directly regulated conduct, not speech. And the regulated conduct was far from necessarily expressive: the orders generally barred people from being outside in public areas at certain hours, whether or not they were engaged in speech protected by the First Amendment.

The orders did include several exceptions to that prohibition. But those exceptions did not turn on whether people were engaged in speech. To the contrary, they permitted certain people to be outside in public areas regardless of their purposes for being there, including medical personnel, members of the media, and the Utah National Guard. And they exempted persons engaged in several specific, nonexpressive activities—such as traveling to the airport or

obtaining food. But none of the exceptions permitted people to be outside in public places for the purpose of engaging in speech protected by the First Amendment.

There is no dispute, to be sure, that the orders incidentally burdened the Plaintiffs' speech. The orders included no exception for people—like the Plaintiffs—who "combined" the regulable conduct of being outside in public areas with the necessarily expressive activity of protesting as part of "the same course of conduct." *O'Brien*, 391 U.S. at 376. But because the orders "on [their] faces . . . did not regulate conduct that was necessarily expressive," *Arcara*, 478 U.S. at 702, they are subject to review under *O'Brien*.

### 2.

The Plaintiffs argue that even if the curfew orders were not content-based on their faces, the court must treat them as content-based because they cannot be "*justified* without reference to the content of the regulated speech," or because they were issued by Mayor Mendenhall "because of disagreement with the message [the speech] convey[ed]." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark*, 468 U.S. at 293) (emphasis in original). The Mayor's purpose in enacting the curfew orders "is the controlling consideration," *id.*, in determining whether they fall within this "additional category of [content-based] laws," *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).[1]

---

[1] There may be tension between the Supreme Court's treatment of governmental motives in *O'Brien*, on the one hand, and in *Ward* and *Reed* on the other. In *O'Brien*, the Court recognized the "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." 391 U.S. at 383. But in *Reed*, the Court described *Ward*'s "framework" as authorizing courts to "look[] to governmental motive" in determining whether a facially content-neutral law should be treated as content-based, 576 U.S. at 167, though neither *Reed* nor *Ward* actually deemed a facially content-neutral law to be content-based because of improper motives. The court need not determine the extent to which it may properly consider evidence regarding the City's motives under these precedents, however, because the Plaintiffs have not presented *any* evidence indicating that those motives were related "to the content of expression." *Ward*, 491 U.S. at 791.

The court concludes there can be no real dispute that the Mayor's purpose in issuing the orders was to regulate conduct, not speech. In the May 30th order, for example, Mayor Mendenhall explained that she was enacting a curfew in response to the violent and destructive conduct that had occurred, such as "the burning of a police vehicle in the city street." Dkt. No. 41-1 at 2. She further explained that the order was intended "to preserve order necessary to protect the public health, safety, and welfare, especially during the time periods where much of [violence and destruction] could occur under cover of darkness." *Id.*

What is more, the Plaintiffs have presented no evidence whatsoever to support their accusation that the Mayor enacted the curfew orders because she disagreed with the viewpoint of those protesting the death of George Floyd. Nor is this accusation plausible given the evidence that is in the record. To the contrary, Mayor Mendenhall openly and prominently embraced the viewpoint of the protesters that George Floyd's death was a "murder at the hands of rogue police officers." Dkt. No. 44-13 at 3. She also publicly voiced agreement with the broader, more systemic views of the protesters, expressing commitment "to intentionally addressing and dismantling the systemic oppression, discrimination, racism, and bigotry" that she said existed in the City. *Id.* at 2. The court sees nothing in the record that would lead it to doubt the sincerity of the views the Mayor expressed. For all of these reasons, the court cannot conclude that the curfew orders were based on, or in any way reflected, disagreement with the *content* of the protesters' speech, as opposed to the violent and destructive conduct that accompanied that speech.

### 3.

The Plaintiffs also appear to contend that the City's *enforcement* of the curfew orders varied based on the content of individuals' speech and thus that strict scrutiny applies. Courts

have recognized that "selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's [enforcement] choices turn on the content or viewpoint of speech." *E.g.*, *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). But even construed in the light most favorable to the Plaintiffs, the evidence they rely on suggests—at most—that the City's enforcement of the orders was directed at speech in a content-neutral manner.

In support of their selective-enforcement argument, the Plaintiffs contend that the City did not enforce the orders against people who were not protesting the death of George Floyd. For example, the Plaintiffs point to evidence suggesting that the City did not enforce the orders against people who were outside walking their dogs in public areas during the curfew, even though (Plaintiffs assert) the orders did not include an exception for dog-walking.[2] *See, e.g.*, Dkt. No. 42-18 (1:08:40–1:10:06). But this evidence does not support the proposition that any selective enforcement was based on the *content* of anyone's speech. Dog-walking is not expressive conduct, after all. And the Plaintiffs have not presented *any* evidence that the City did not enforce the curfew orders against anyone engaged in public speech—or necessarily expressive conduct—such as, for example, a street preacher, a counter-protester, or a demonstrator protesting something other than the death of George Floyd. At the very most, the evidence identified by the Plaintiffs thus supports only the inference that the City selectively enforced the curfew against those engaged in speech or expressive conduct, and not against those engaged in wholly nonexpressive conduct. To the extent the practical result, during curfew hours, was "a total ban on public expression within the [City], regardless of the identity of the

---

[2] It is not obvious that Plaintiffs are correct: the curfew orders did contain an exception for persons "caring for a family member, friend, *or animal*." Dkt. No. 41-1 at 2 (emphasis added).

speaker or the subject of the message," the curfew orders were "content neutral." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1220 (10th Cir. 2007).

To be sure, the Plaintiffs also point to Officer VanDongen's email as evidence of content-based selective enforcement. And Officer VanDongen did express concern that the curfew was being selectively enforced against peaceful protesters and not against people who were engaged in other peaceful activities elsewhere in the City. But the email does not create a genuine dispute regarding whether the City engaged in content-based selective enforcement for two independent reasons.

First, Officer VanDongen sent the email on June 3rd, and he was expressly referring to the enforcement of curfew on the night of June 2nd. *See* Dkt. No. 63-16 at 21 (78:15–20). But the Plaintiffs' claims arise entirely from the enforcement of curfew on May 30th and June 1st, not on June 2nd. The Plaintiffs have presented no evidence to support the conclusion that Officer VanDongen was referring to the enforcement of curfew on May 30th or June 1st, or that his email is probative of how the curfew orders were enforced on those nights. And given the rapidly changing circumstances relating to the sudden and intense—but ultimately short-lived—outbreak of unrest and violence in the City (which led Mayor Mendenhall to terminate the second curfew order on June 3rd, five days earlier than planned), the court does not believe that an inference that nothing material had changed between the time the Plaintiffs' claims arose and the night of June 2nd can be justified. Indeed, in the same email, Officer VanDongen stated his belief that a curfew was "unequivocally needed" on May 30th "for public safety reasons." *Id.* at 21 (78:22–24).

Second, even with respect to the evening to which it does refer, Officer VanDongen's email suggests only that the City had engaged in content-neutral selective enforcement,

enforcing the curfew against "a group of protestors" but not enforcing it "anywhere else in the City" or against "citizens doing peaceful things." Nothing in the email supports a reasonable inference that any selective enforcement was motivated by the content of the protesters' speech. To the contrary, the email—including the distinction it drew between "a group of protestors," on the one hand, and "citizens doing peaceful things," on the other hand, suggests that the selective enforcement Officer VanDongen perceived was motivated by "purposes unrelated to the content of expression," such as maintaining public safety and order. *Ward*, 491 U.S. at 791. Significantly, Officer VanDongen did not state—either in his email or in his deposition—that the curfew was not enforced against citizens other than the protesters who were engaged in public expression. And he clarified at his deposition that the City had focused its enforcement on a specific geographic area because that is where "violence and civil unrest" had occurred, Dkt. No. 63-16 at 19 (72:17–22), and that the City lacked "the ability or bandwidth to enforce [the] curfew order in other parts of the city," *id.* at 20 (75:7–18). He also explained that the concern he was trying to express in his email was the potential "*perception* of selective policing," not a belief that the selective enforcement that he perceived was motivated by actual "bias" against the protesters. *Id.* (emphasis added).

Altogether, the Plaintiffs do not identify anything in Officer VanDongen's email, his deposition testimony, or anywhere else in the record that could support a justifiable inference that any selective enforcement of the curfew was motivated by the protesters' message, as opposed to the violence and destruction that accompanied the protests on May 30th and June 1st.[3]

_____

[3] The Plaintiffs rely on *Epps v. City and County of Denver*, in which a district court held that a "reasonable jury" could conclude that Denver had selectively enforced a facially neutral

## B.

It follows that the Plaintiffs' First Amendment claim fails if the curfew orders—whether viewed as regulations of conduct that is not necessarily expressive or as content-neutral restrictions on expression—satisfied intermediate scrutiny on May 30th and June 1st. Under the First Amendment, a restriction survives such scrutiny if it is "narrowly tailored to achieving

---

curfew by "prohibiting protestors—and only protestors—from accessing public places after dark." 588 F. Supp. 3d 1164, 1171, 1172 (D. Colo 2022). That court relied on a text message from a police officer stating that "the curfew 'is only to be used in relation to protect activity,'" and that "an individual must be engaged in 'protest-related behavior' to be cited for a curfew violation." *Id.* at 1172. Interpreting the "ban on protesting" that was the practical result of the enforcement policy reflected in the text message to be "content-based because it applied only to those participating in what the [police department] referred to as the George Floyd protests," the district court applied strict scrutiny in analyzing the constitutionality of Denver's curfew. *Id.*

Officer VanDongen's email here is considerably less clear than the specific and unambiguous statement of enforcement policy made in the text message in *Epps*. But even apart from that distinction, this court does not find the reasoning in *Epps* persuasive. The court in that case appears to have concluded that simply because a curfew's enforcement was "*speech*-based" in practice, it was necessarily *content*-based as well. *Id.* (emphasis added). But as discussed, a regulation may be both speech-based and content-neutral—such as a time, place, and manner restriction—and the *Epps* court appears to have simply overlooked that possibility.

As discussed, even if Officer VanDongen's email supports the inference that the City engaged in speech-based, selective enforcement similar to that described in the *Epps* text message, the Plaintiffs here have pointed to no evidence that any selective enforcement was motivated by the *content* of the protesters' expression. Rather than follow *Epps*, this court will accordingly join the multiple courts that have applied intermediate scrutiny in upholding curfews enacted after high-profile police killings. *See, e.g.*, *Tinius v. Choi*, 77 F.4th 691, 702 (D.C. Cir. 2023) (distinguishing *Epps* on the basis that the curfew there apparently "was enforced in practice to *retaliate* against protestors based on their speech") (emphasis added); *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 515 n.2 (7th Cir. 2024) (recognizing that "the curfew . . . regulated all speech . . . during nighttime hours regardless of speaker or viewpoint" and was not "content based" simply because it "disproportionately affect[ed] would-be protestors" (cleaned up)); *Jeffery v. City of New York*, No. 20-cv-2843, 2022 WL 204233, at *7 (E.D.N.Y. Jan. 24, 2022), *aff'd on other grounds*, 113 F.4th 176 (2d Cir. 2024), *cert. denied*, No. 24-642, 2025 WL 581630 (Feb. 24, 2025); *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 412–14 (S.D.N.Y. 2021); *Larson v. City of Minneapolis*, 568 F. Supp. 3d 997, 1007–12 (D. Minn. 2021).

significant government interests," and "leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1220.[4]

The court has no difficulty concluding that the challenged curfew orders were designed to serve significant government interests. Mayor Mendenhall issued the orders in response to the sudden and severe unrest that erupted in the City in the wake of George Floyd's death. That unrest posed significant dangers to people and property. Crowds of people looted multiple businesses, smashed windows, vandalized buildings with spray paint, and set a police vehicle on fire. After an individual confronted a crowd with a bow and arrow, the crowd swarmed the individual, beat him, and burned his vehicle. And when law enforcement approached a crowd of protesters, members of the crowd began throwing bottles, rocks, and other projectiles at the officers. There can be no doubt that the City had a "significant government interest" in maintaining "public safety" by preventing violence and destruction. *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997). Indeed, the "[p]rotection of the health and safety of the public is a *paramount* governmental interest." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981) (emphasis added).

The court further concludes that the curfew orders were narrowly tailored to serve that interest. The Plaintiffs argue that the orders were not narrowly tailored because they covered the

---

[4] As indicated, the court believes it would also be proper to analyze the curfew orders under *O'Brien*. Courts consider four factors when applying the "*O'Brien* test": whether (1) the relevant government actor had "the constitutional power to enact the" regulation, (2) "the regulation . . . further[s] an important or substantial government interest," (3) "the government interest . . . [is] unrelated to the suppression of free expression," and (4) "the restriction . . . [is] no greater than is essential to the furtherance of the government interest." *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002). Nevertheless, the court will apply the intermediate scrutiny standard for content-neutral "time, place, or manner restrictions" because it "is little, if any different from" the *O'Brien* test, and the Supreme Court has made clear that a regulation that satisfies the former necessarily satisfies the latter. *Clark*, 468 U.S. at 298 & n.8.

entire area of the City, while the violence and property destruction were limited to "the downtown area." Dkt. No. 63 at 30. But the Supreme Court has clarified that a time, place, and manner restriction "need not be the least restrictive or least intrusive means of" serving a significant government interest. *Ward*, 491 U.S. at 798. Rather, the restriction need only "promote a substantial government interest that would be achieved less effectively absent the regulation," unless "a substantial portion of the [restriction's] burden on speech does not serve to advance [those] goals." *Id.* at 799 (cleaned up).

The court has little difficulty concluding that the curfew orders were appropriately tailored to prevent violence and property destruction. Not only were they limited in scope and duration, they were adjusted in real time to respond to rapidly changing circumstances. When the risk of violence and property destruction was at its highest on May 30th, Mayor Mendenhall responded by instituting a curfew that lasted from that evening until the morning of June 1st. After the first curfew expired on June 1st, the Mayor did not impose another daytime curfew. While she determined that some restrictions were still necessary given the lingering unrest in the City and the continuing unrest nationwide, she pared back the curfew significantly to apply only at night. Finally, Mayor Mendenhall terminated the second curfew entirely on June 3rd, five days earlier than originally intended, after concluding that the risk of violence and property destruction had sufficiently abated that a curfew was no longer necessary.

Each of these decisions reflects the Mayor's careful attention to ensuring that the scope of the curfew remained commensurate with the changing risk of violence and property damage, and the rapid restoration of public order leaves little doubt that the curfew was "a direct and effective way" of achieving the City's substantial interests. *Id.* at 800. And although the curfew orders applied City-wide, it does not follow that they were not narrowly tailored. Had the City limited

the curfew orders to the specific areas where unrest had already taken place, individuals intent on destruction could have evaded the curfew simply by traveling to areas not covered by the orders. To the extent the Plaintiffs "hypothesize[]" that "alternative regulatory methods" would have better achieved the City's interests, the court must "defer to the [Mayor's] reasonable determination that" the City's "interests overall would [have] be[en] served less effectively without the" curfew "than with it." *Id.* at 800–01.

Finally, the court concludes that the curfew orders left open ample alternative channels for communication. Not only was the curfew brief—starting on May 30th and ending on June 3rd—the *daytime* curfew lasted only one day. After that, the curfew applied only at night, permitting protests—or any other type of public speech or expression—any time during the day. *See Tinius v. Choi*, 77 F.4th 691, 702 (D.C. Cir. 2023) (holding that a nighttime curfew left open ample alternative channels of communication where protesters "were free to protest during the day" and "to protest at night after the . . . curfew expired"). Further, as the City points out, even while the curfew was in effect, the protesters were free to use "online means like social media or email" to protest George Floyd's death. Dkt. No. 40 at 44. And the Tenth Circuit has recognized that ample alternative channels of communication may exist even if protesters "had no close, physical interaction with their intended audience." *Citizens for Peace in Space*, 477 F.3d at 1225. The Plaintiffs respond only that "a full restriction on all assemblies within the City of Salt Lake for 72 hours straight does not allow for alternative channels of communication," without citing any authority for that proposition or addressing the alternative channels the City identifies. Dkt. No. 63 at 30. In all events, the curfew's longest continuous period was only 34 hours, from 8:00 P.M. on May 30th (the day the violence and property damage erupted) until 6:00 A.M. on June 1st. The court has little doubt that the Plaintiffs "could . . . have taken advantage of [the]

opportunit[ies]" for communication the City has identified—protesting online via social media or in public before and after the curfew was in effect, and, except on May 31st, during the daytime while the curfew was in effect—or that those opportunities were sufficient for the orders to satisfy intermediate scrutiny. *Tinius*, 77 F.4th at 702.

For these reasons, the court concludes that the curfew orders satisfied intermediate scrutiny, at least on May 30th and June 1st, and that the Plaintiffs' principal First Amendment contention fails.

## C.

In addition to arguing that the curfew orders constituted a content-based restriction on speech, the Plaintiffs raise two other First Amendment arguments. *First*, the Plaintiffs appear to argue that the curfew orders were unconstitutional under the First Amendment "substantial overbreadth" doctrine, which permits plaintiffs to challenge a "statute on the ground that it may be unconstitutionally applied to others." *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). But the Supreme Court has clarified "that overbreadth analysis is inappropriate if the statute being challenged has been amended or repealed." *Id.* at 582. Because the curfew orders were rescinded long before the Plaintiffs filed this action, their overbreadth argument necessarily fails.

*Second*, the Plaintiffs describe the curfew as an unconstitutional "prior restraint" of speech. But a prior restraint "[g]enerally . . . restricts speech in advance on the basis of content." *Taylor v. Roswell Independent Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013). And "[p]rior restraints generally take one of two classic forms: judicial injunctions and administrative licensing schemes." *Id.*

The Plaintiffs have not explained how the curfew orders qualify as prior restraints under this understanding. As already explained, the orders did not "restrict[] speech . . . on the basis of

content." *Id*. And they did not resemble judicial injunctions, which "forbid[] specific speakers from specific expression," because they applied generally. *Id.* Finally, the orders did not resemble an administrative licensing scheme because they did not "require[] a speaker to obtain approval before engaging in certain forms of speech in a given forum, sometimes based on the volume or scale of the intended speech." *Id.* To be sure, the orders did include a general exception to the curfew for "[a]ny person to whom permission by authorized Salt Lake City officials is specifically granted." *E.g.*, Dkt. No. 41-1 at 3. But the Plaintiffs do not address this clause or how (or even whether) the City applied it in practice. Certainly, they have identified no evidence that the City exercised its discretion under this provision to create some sort of *de facto* licensing scheme for public speech—for example by allowing anyone to break curfew for the purpose of engaging in public expression, or, for that matter, by denying anyone permission to break curfew for that purpose. The court accordingly rejects Plaintiffs' argument that the curfew orders amounted to unconstitutional prior restraints.

### D.

In addition to their First Amendment claims, the Plaintiffs assert violations of a smattering of other constitutional doctrines and provisions. *First*, the Plaintiffs contend that the curfew orders were unconstitutionally vague. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The court concludes that the curfew orders clearly satisfied both requirements. The orders generally required people not to be in public during certain hours, subject to a few specific, enumerated exceptions. Persons of ordinary intelligence would thus have "had fair notice from the language

of" the orders that if they were in public during curfew hours and not covered by an exception, they would face criminal penalties. *Parker v. Levy*, 417 U.S. 733, 755 (1974). And the orders themselves did not encourage arbitrary and discriminatory enforcement. The relevant question "is not whether discriminatory enforcement [in fact] occurred"—after all, given our long tradition of prosecutorial discretion, that may occur however clear a criminal prohibition— rather, it is whether the "language" of the orders "is so imprecise that discriminatory enforcement is a real possibility." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1237 (10th Cir. 2023) (quoting *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991)). Because the Plaintiffs have not pointed to any "bare, standardless" language in the curfew orders, their void-for-vagueness challenge fails. *Id.* at 1238.

*Second*, several of the Plaintiffs argue that they were wrongfully arrested in violation of the Fourth Amendment. "A plaintiff may recover damages under § 1983 for wrongful arrest if she shows she was arrested without probable cause." *Cottrell v. Kaysville City*, 994 F.2d 730, 733 (10th Cir. 1993). But for most of the Plaintiffs who were arrested, there clearly was "probable cause to believe that a criminal offense ha[d] been or [was] being committed." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). It is undisputed that these Plaintiffs were in public after the curfew had commenced, and they do not argue that they fell within an exception to the curfew orders. It follows that "the circumstances, viewed objectively, justified" their arrests. *Devenpeck*, 543 U.S. at 153 (cleaned up).

One of the Plaintiffs who was arrested, Ms. Jones, does maintain that there was no probable cause for her arrest because she fell under the orders' exception for "medical personnel." Dkt. No. 41-1 at 2; Dkt. No. 41-2 at 2. Ms. Jones appears to have used red tape to

make red crosses on her clothing and backpack. *See, e.g.*, Dkt. No. 46-24 at 2. But she expressly conceded that she was not acting as medical personnel at the time of—or just prior to—her arrest. *See* Dkt. No. 46-1 at 15 (123:16–21). She also acknowledged that the only credential she had to identify herself as a medic was the red tape on her clothing and backpack. *See id.* at 15 (123:3–6). Given that Ms. Jones was not providing medical care at the time of her arrest and was identified as medical personnel only by the red tape—which any of the protesters could have placed on their clothes or bags, regardless of whether they actually intended or were qualified to provide medical care—the court concludes that it was objectively reasonable, under the circumstances, for law enforcement to conclude that Ms. Jones was breaking curfew and did not fall under an exception.

*Third*, Mr. Westergard, Mr. Knebel, Mr. Winkworth, Ms. Jones, and Ms. Lechuga contend that they were subjected to excessive force in violation of the Fourth Amendment. But to hold the City liable for the alleged excessive force, the Plaintiffs must show that the use of force resulted from "an official policy or custom" of the City. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023). The only official policy or custom that the Plaintiffs identify is the curfew itself. *See* Dkt. No. 63 at 18. But it is undisputed that neither the curfew orders themselves nor the Mayor's statements regarding those orders addressed how (if at all) law enforcement should use force against curfew violators. It follows that the Plaintiffs cannot show a "direct causal link" between the orders and the allegedly excessive force, and that the City is thus entitled to summary judgment on the excessive-force claims. *Board of Cnty. Commr's v. Brown*, 520 U.S. 397, 404 (1997).

To be sure, the Plaintiffs assert in passing that "[t]here was also an order that authorized the use of less lethal weapons" before Mr. Knebel and Mr. Winkworth were shot on May 30th,

and they refer to a City "policy" regarding the use of force that was separate from the curfew orders. Dkt. No. 63 at 19, 40. But even if the Plaintiffs' stray references are construed as arguments that "an official policy or custom" other than the curfew itself caused the allegedly excessive uses of force, the court concludes that they do not suffice to create a material issue of fact regarding the City's liability. The Plaintiffs' reference to authorization for less lethal force appears to be drawn from a "CAD log" maintained by police "dispatchers," Dkt. No. 70 at 59, which includes an entry indicating that "LESS LETHAL [was] AUTHORIZED" on May 30th, Dkt. No. 63-4 at 18. But assuming its accuracy for purposes of summary judgment, the CAD log does not indicate *who* authorized less lethal force. And while "an official policy or custom" may include "the decisions of employees with final policymaking authority" or "the ratification by such final policymakers of [certain] decisions," the Plaintiffs have neither identified evidence nor provided argument that the use of less lethal force was authorized or ratified by a City employee with final policymaking authority. *Lucas*, 58 F.4th at 1145 (cleaned up).

As for the Plaintiffs' references to the City's "use of force manual," Dkt. No. 63 at 16, the Plaintiffs argue only that the shootings of Mr. Knebel and Mr. Winkworth did *not* comply with that policy. They assert, for example, that officers did not provide sufficient "warning" before opening fire, "did not document the use of less lethal" weapons, and targeted "[t]he head and neck" areas, all in violation of the policy. *Id.*; *see* Dkt. No. 63-5 at 5. In fact, they do not identify a single way in which the shootings *complied* with the policy. It follows that even if the manual constitutes "an official policy or custom," the Plaintiffs have provided no evidence suggesting any sort of "direct causal link" between the manual and the two less-lethal shootings they allege.

*Finally*, the Plaintiffs argue that the curfew orders violated their procedural due process rights. Under the Fourteenth Amendment, the state generally may not deprive a person of life, liberty, or property without "some kind of notice" and "some kind of hearing." *Moore v. Board of Cnty. Comm'rs*, 507 F.3d 1257, 1259 (10th Cir. 2007) (cleaned up). The Plaintiffs maintain that their due process rights were violated because Mayor Mendenhall did not "hold a public hearing" before issuing the curfew orders. Dkt. No. 63 at 35.

But the due process notice and hearing requirements do not apply to "legislative," as opposed to "adjudicative," government action. *Onyx Props. LLC v. Board of Cnty. Comm'rs*, 838 F.3d 1039, 1045–46 (10th Cir. 2016). As the Tenth Circuit has recognized, "[l]egislative action is usually reflective of some public policy relating to matters of a permanent or general character, is not normally restricted to identifiable persons or groups, and is usually prospective in nature." *Id.* at 1047 (quoting *Cherry Hills Resort v. Cherry Hills Vill.*, 757 P.2d 622, 625 (Colo. 1988)). "Adjudicative" action, by contrast, generally "has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed." *Id.* at 1046.

Here the court concludes that the curfew orders were legislative in character. To be sure, the orders were temporary, not permanent. But they were clearly prospective and general in character: the curfew took effect once the Mayor assessed the danger facing the city as a whole and issued the orders, not based on grounds to be individually assessed after the orders issued. Further, by their plain terms, the orders (and their exceptions) applied generally throughout the City.

Even if the curfew orders were adjudicative, moreover, a hearing was likely unnecessary under the circumstances. As the Supreme Court has explained, although "due process ordinarily requires an opportunity for some kind of hearing prior to the deprivation of a [protected] interest,

. . . summary administrative action may be justified in emergency situations" without a hearing. *Hodel*, 452 U.S. at 299–300 (cleaned up). Because "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action," *id.* at 300, this exception would appear to cover Mayor Mendenhall's emergency response to the sudden outbreak of violence and property destruction confronting the City when she issued the curfew orders.

*    *    *

For the foregoing reasons, the City's motion for summary judgment is **GRANTED** and the Plaintiffs' motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED**.

Dated this 31st day of March, 2025.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge